Argued and submitted December 13, 2004, remanded in part for reconsideration; otherwise affirmed March 14, petition for review denied July 6, 2005 (338 Or 681)

# N.W.D.A. THE COMMUNITY ASSOCIATION OF NORTHWEST PORTLAND, INC.,

Frank Dixon, and Ruth C. Roth,
*Petitioners,*

*and*

## Don VOLKMER,
*Intervenor below,*

*v.*

## CITY OF PORTLAND,

Nob Hill Business Association, Richard Singer,
Donald Singer, CNF, Inc., John A. Onder,
and Williams & Dame Development, Inc.,
*Respondents.*

## NICOL INVESTMENT, INC.,
*Petitioner below,*

*v.*

## CITY OF PORTLAND,
*Respondent below,*

*and*

## John A. ONDER

and Williams & Dame Development, Inc.,
*Intervenors below.*

2003-162, 2003-163, 2003-164, 2003-183, 2003-195,
2003-165, 2003-166, 2003-167; A126345

108 P3d 589

Edward J. Sullivan argued the cause for petitioners. With him on the brief were Carrie A. Richter and Garvey Schubert Barer.

Peter Kasting, Chief Deputy City Attorney, argued the cause and filed the brief for respondent City of Portland.

Timothy V. Ramis argued the cause for respondent Nob Hill Business Association. With him on the brief was Gary Firestone.

Steven W. Abel, Ellen Hawes Grover, and Stoel Rives, LLP filed the brief for respondent CNF, Inc.

Richard H. Allen, Christen C. White, and Ball Janik, LLP filed the brief for respondents John A. Onder and Williams & Dame Development, Inc.

No appearance for respondents Richard Singer and Donald Singer.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Deits, Judge pro tempore.

DEITS, J. pro tempore.

---

* Brewer, C. J., *vice* Armstrong, J.

**DEITS, J. pro tempore**

Petitioners[1] seek judicial review of an order of the Land Use Board of Appeals (LUBA) concerning the City of Portland's adoption of the "Northwest District Plan" and city code amendments that authorize the construction of several commercial parking structures in the Alphabet Historic District in the Northwest District of the city. *NWDA v. City of Portland*, 47 Or LUBA 533 (2004). We review LUBA's order to determine whether it is unlawful in substance, ORS 197.850(9), and affirm in part and remand in part.

We take the facts concerning the pertinent ordinances from LUBA's order:

"The challenged decisions are the culmination of a lengthy process to update the city comprehensive plan and zoning code regulations governing the Northwest District of the city. The Northwest District is governed by the Northwest District Policy Plan, part of the city's comprehensive plan adopted in 1977. In 1999, petitioner NWDA proposed a number of changes to update the Northwest District Policy Plan. In June 2000, the city council directed planning staff to review NWDA's proposals in combination with an ongoing planning effort related to industrial lands north of NW Vaughn Street. The city's planning efforts resulted in the following decisions.

"Ordinance 177920 adopts the Northwest District Plan (NDP), replacing the 1977 Northwest District Policy Plan. As relevant in this appeal, the NDP rezones a number of acres in the Northwest District, including a 'Transition Area' south of NW Vaughn Street where a number of parcels zoned for industrial uses are placed into employment zone designations allowing commercial, office and residential uses. Ordinance 177920 also amends (1) the Central City Plan by rezoning a number of properties along the Burnside Corridor, south of the Northwest District, and (2) the Guild's Lake Industrial Sanctuary Plan to redesignate 16 acres within the sanctuary north of NW Vaughn

---

[1] Petitioner Frank Dixon is a resident of Northwest Portland and the president of petitioner Northwest District Association, The Community Association of Northwest Portland, Inc. (NWDA). Ruth Roth is also named as a petitioner on review. LUBA generally referred to petitioners as NWDA. For consistency, we do likewise.

from industrial to employment comprehensive plan map designations.

"Ordinance 178020 adopts city code amendments governing parking in the Northwest District. As relevant here, Ordinance 178020 authorizes construction of six commercial parking structures on specifically identified sites that are either zoned residential or split-zoned for residential and commercial uses. Five of the six sites are currently used as surface parking lots. Design review is required for all six parking structures. Four of the parking structures would provide between 75 and 110 spaces each and would be allowed outright as permitted uses in the pertinent zones. Two structures would require conditional use approval. Ordinance 178020 exempts three of the parking structures from applicable setback requirements and allows zero setbacks. If constructed, the six parking structures would result in a net increase of 402 off-street commercial parking spaces. Ordinance 178020 also allows commercial parking on private accessory use parking spaces in residential areas."

*NWDA*, 47 Or LUBA at 537-38 (footnote omitted).

On judicial review, NWDA raises five assignments of error that pertain to LUBA's analysis of (1) the city's decision to allow the commercial parking structures, (2) the consistency between the requirements of ORS 197.307 and two of the city's ordinances, *i.e.*, Ordinance 177920 and Ordinance 178020, and (3) the consistency between Ordinance 177920 and Goal 2 and Goal 9 as well as Title 4 of the Metro Code's Functional Plan. We write only to address NWDA's first assignment of error, concerning whether the commercial parking structures are inconsistent with the base zone and planning designations in violation of Goal 2 and ORS 197.175(2), and its second assignment of error, concerning whether the city failed to comply with Goal 5 in approving the parking structures. We reject NWDA's remaining assignments of error without discussion.

■ In its first assignment of error, NWDA asserts that LUBA erred by affirming the city's decision to allow commercial parking structures[2] because the decision was inconsistent with the base zone and planning designations in the

---

[2] Portland City Code (PCC) 33.920.210 describes "commercial parking" as facilities that

city's comprehensive plan in violation of the requirement in Goal 2 and ORS 197.175(2) that the city's land use decisions be consistent with its comprehensive plan.[3] For that reason, NWDA asserts that the city could not allow commercial parking structures "without first amending the comprehensive plan map and zone classification to permit such uses in residential zones."

NWDA acknowledges, however, that several provisions of the Portland City Code that regulate plan districts indicate that district regulations may modify the regulations of the base zone and control over the base zone regulations when there is a conflict.[4] Nonetheless, NWDA asserts that those provisions do not allow a plan district to "deviate so much as to be inconsistent with the comprehensive plan where uses are dictated and linked to specific base zoning classifications." Further, NWDA asserts that those provisions do "not * * * permit deviations in *use* that are contrary to the plan." (Emphasis added.) Instead, according to NWDA, only development standards are subject to being superseded by plan district regulations. In support of that argument, NWDA relies on two tables in the city's code. Table 120-1 lists use categories in multi-dwelling zones and does not indicate

"provide parking that is not accessory to a specific use. A fee may or may not be charged. A facility that provides both accessory parking for a specific use and regular fee parking for people not connected to the use is also classified as a Commercial Parking facility."

[3] Goal 2 provides, in part, that "[c]ity, county, state and federal agency and special district plans and actions related to land use shall be consistent with the comprehensive plans of cities and counties and regional plans adopted under ORS Chapter 268." Additionally, ORS 197.175(2) provides, in part, that, "[p]ursuant to ORS chapters 195, 196 and 197, each city and county in this state shall[,]" among other things, "[e]nact land use regulations to implement their comprehensive plans[.]"

[4] Specifically, PCC 33.500.030 provides:

"Plan district regulations are applied in conjunction with a base zone. The plan district provisions may modify any portion of the regulations of the base zone, overlay zone, or other regulations of this Title. The provisions may apply additional requirements or allow exceptions to general regulations."

Additionally, PCC 33.500.040 provides:

"When there is a conflict between the plan district regulations and base zone, overlay zone, or other regulations of this Title, the plan district regulations control. The specific regulations of the base zone, overlay zones, or other regulations of this Title apply unless the plan district provides other regulations for the same specific topic."

the impact of a plan district regulation on uses in the zone. Table 120-3, however, lists development standards in the same zone and notes that "[t]hese standards may be superseded by the regulations of an overlay zone or plan district." According to NWDA, those tables demonstrate that use regulations in the base zones may not be altered by provisions in the NDP and, accordingly, in NWDA's view, the city erred in allowing the parking structures.

Respondent Nob Hill disagrees that the city's decision to allow the parking structures is inconsistent with the city's comprehensive plan.[5] According to Nob Hill, the wording of PCC 33.500.030 and PCC 33.500.040 clearly demonstrates that plan district regulations may modify and prevail over inconsistent base zone regulations. We understand Nob Hill to argue that plan district regulations that modify or prevail over inconsistent base zone regulations allow the city to address particular concerns for identified areas of the city and that NWDA has failed to identify any provision in the comprehensive plan that restricts the city's authority to establish plan districts and provide for particular uses that are inconsistent with the base zone regulations.

As noted above, LUBA concluded that the city did not err in approving the commercial parking structures. It reasoned that, "even if the commercial parking structures are inconsistent with the residential base zones, a point neither the city nor Nob Hill concede," PCC 33.500.030 and PCC 33.500.040 expressly allow the city to amend the NDP to authorize uses that are not allowed in the base zones. *NWDA*, 47 Or LUBA at 551.

We agree with LUBA. Ordinance 178020 amended the NDP that had been adopted by Ordiance 177920 and incorporated it into the city's comprehensive plan. Even if we assume that the commercial parking structures are inconsistent with the uses in the base zones, PCC 33.500.030 and

---

[5] The respondents who appeared on review either adopted the responses of respondent Nob Hill with regard to the assignments of error that we address in this opinion or did not participate and provide a response with respect to those assignments of error. For that reason, in this opinion, we refer to only respondent Nob Hill.

PCC 33.500.040 authorize the city to allow those uses. PCC 33.500.030 and PCC 33.500.040 demonstrate that the city has built some flexibility into its land use controls that works to accommodate the circumstances in this case. Further, we find nothing in either the wording of PCC 33.500.030 or PCC 33.500.040 that supports NWDA's view that plan district regulations may modify only the development standards of the base zone. The express language of those city code provisions includes no such distinction between use regulations and development standards. Unlike NWDA, we do not regard the wording of the note in Table 120-3 as significant, particularly when the code provisions expressly authorize the city to modify use regulations and development standards. Moreover, NWDA fails to identify any provision in the comprehensive plan that circumscribes the city's authority to establish plan districts or circumscribes the city's authority under PCC 33.500.030 and PCC 33.500.040 to provide for plan district use regulations that are inconsistent with the base zone regulations. The question presented in this case is not whether it was good policy for the city to enact those provisions to allow itself the flexibility to affect the uses in the base zones in this manner. Rather, the issue is what the text of the pertinent provisions provides. We conclude that, based on the wording of those provisions, the city's decision is not inconsistent with the comprehensive plan in violation of Goal 2 or ORS 197.175(2).

In its second assignment of error, NWDA asserts that LUBA erred by concluding that the city's decision complies with Goal 5. NWDA contends that the city's decision to allow the commercial parking structures in the Alphabet Historic District with underlying base residential zones is a post-acknowledgment plan amendment (PAPA)[6] to which Goal 5 applies because it allows "new uses that *could* be conflicting uses" with that significant Goal 5 resource. OAR 660-023-0250(3)(b) (emphasis added). For that reason, NWDA

---

[6] A post-acknowledgment plan amendment "encompasses actions taken in accordance with ORS 197.610 through 197.625, including amendments to an acknowledged comprehensive plan or land use regulation and the adoption of any new plan or land use regulation." OAR 660-023-0010(5).

argues that a determination of the economic, social, environmental, and energy (ESEE) consequences was required in order to comply with Goal 5.[7] Alternatively, NWDA asserts that, even if an ESEE analysis is not required, the city's findings do not demonstrate compliance with Goal 5 because "LUBA failed to inquire whether reducing the applicable setback requirements for these parking structures when allowing this conflicting use still furthers the government's policy decision to either protect the resource fully, protect the resource in part against conflicting uses, or allow conflicting uses fully."

LUBA did not decide whether the city's decision to allow commercial parking structures in a historic district constituted a new use that could be a conflicting use with the historic district. Instead, LUBA held that, even if the city's decision "triggers application of Goal 5 pursuant to OAR 660-023-0250(3)(b), OAR 660-023-0200(7) exempts the city from the requirement to conduct an ESEE analysis." *NWDA*, 47 Or LUBA at 543. That rule provides:

"Local governments are not required to apply the ESEE process in order to determine a program to protect[8] historic resources. Rather, local governments are encouraged to adopt historic preservation regulations regarding the demolition, removal, or major exterior alteration of all designated historic resources. Historic protection ordinances should be consistent with standards and guidelines recommended in the Standards and Guidelines for Archeology and Historic Preservation published by the U.S. Secretary of the Interior."

LUBA reasoned that,

---

[7] OAR 660-023-0010(2) provides that " 'ESEE consequences' are the positive and negative economic, social, environmental, and energy (ESEE) consequences that could result from a decision to allow, limit, or prohibit a conflicting use." Generally, "[l]ocal governments shall develop a program to achieve Goal 5 for all significant resource sites based on an analysis of the economic, social, environmental, and energy (ESEE) consequences that could result from a decision to allow, limit, or prohibit a conflicting use." OAR 660-023-0040(1).

[8] The term " '[p]rotect' means to require local government review of applications for demolition, removal, or major exterior alteration a historic resource." OAR 660-023-0200(1)(e). In turn " '[h]istoric resources' are those buildings, structures, objects, sites, or districts that have a relationship to events or conditions of the human past." OAR 660-023-0200(1)(c).

"[i]f the city is not required to apply the ESEE process at OAR 660-023-0040 *at all* in determining a program to protect historic resources, it would seem strange to require the city to conduct an ESEE analysis when, as here, the city allows a new use that could conflict with a particular significant Goal 5 resource site protected by an acknowledged program, pursuant to OAR 660-023-0250(3)(b), as NWDA contends."

*NWDA*, 47 Or LUBA at 542-43 (emphasis in original). Nonetheless, relying on one of its earlier cases, LUBA reasoned that, even though an ESEE analysis was not required, the city was required to demonstrate compliance with Goal 5. LUBA stated:

"In *Homebuilders Assoc. v. City of Eugene*, 41 Or LUBA 370, 443-44 (2002), we addressed the question of what Goal 5 requires when triggered by post-acknowledgment plan amendments under OAR 660-023-0250(3). The short answer, we held, is that

" 'the city must demonstrate that, to the extent the [amended code] amends programs that were previously adopted to protect significant Goal 5 resources, the challenged amendments comply with the Goal 5 rule. OAR 660-023-0250(3); *Pekarek v. Wallowa County*, 36 Or LUBA 494, 498 (1999) (where a plan or zoning ordinance amendment affects inventoried Goal 5 resources, the local government must apply the requirements of the Goal 5 rule and determine that the rule is satisfied). *That does not necessarily mean that the city must repeat the entire Goal 5 process, or adopt new or amended ESEE analyses. Where the justification the city adopted to support its original Goal 5 programs also supports the amended Goal 5 programs, the city may simply explain why that is the case.* However, where the original justification does not justify the amended Goal 5 program, part or all of the original justification will need to be amended to support the amended Goal 5 program.'

"As the emphasized language indicates, where application of Goal 5 is triggered pursuant to OAR 660-023-0250(3), the city need not in all cases repeat the entire Goal 5 process, including the ESEE process, even where historic resources are not at issue and OAR 660-023-0200(7) does not come into play. In many cases no more is required than an explanation for why the existing program to protect Goal

5 resources, as amended or affected by the challenged post-acknowledgment plan amendment, continues to be sufficient to protect those resources."

*NWDA*, 47 Or LUBA at 543 (emphasis and brackets in original).

Based on that standard, LUBA concluded that the city's findings demonstrated compliance with Goal 5. It stated:

"Here, the city adopted findings that explain why the disputed commercial parking structures are consistent with preservation of protected historic structures and the historic district. The city's findings rely on the existing Goal 5 program, specifically the requirement that the parking facilities satisfy historic design review standards applicable to proposed development within the historic district. Further, the city relied on limitations imposed under the new parking regulations that reduce the potential height of the parking structures from that otherwise allowed in the applicable zones, and that place a cap on the total number of parking spaces created. NWDA argues that those findings do not constitute an adequate ESEE analysis; however, as explained, the city is not required to conduct an ESEE analysis under the present circumstances. NWDA does not otherwise challenge the city's findings, or explain why those findings are inadequate to demonstrate that the city's program to protect the historic district, to the extent amended or affected by Ordinance 178020, continues to comply with Goal 5."

*Id.* at 544.

■ We begin by determining whether Goal 5 applies to the city's decision. On review, NWDA and Nob Hill disagree about whether the requirements of OAR 660-023-0250(3)(b) apply such that Goal 5 applies. OAR 660-023-0250(3) provides, in part:

"Local governments are not required to apply Goal 5 in consideration of a PAPA unless the PAPA affects a Goal 5 resource. For purposes of this section, a PAPA would affect a Goal 5 resource only if:

"* * * * *

"(b) The PAPA allows new uses that could be conflicting uses with a particular significant Goal 5 resource site[9] on an acknowledged resource list[.]"

Although the implementing rules governing Goal 5 do not define the term "new use," OAR 660-023-0010(1) defines "conflicting use" to mean" a land use, or other activity reasonably and customarily subject to land use regulations, that *could* adversely affect a significant Goal 5 resource * * *." (Emphasis added.)

NWDA argues that the city's decision to allow commercial parking structures is a new use that could be a conflicting use with the historic district. According to NWDA,

"[a] commercial parking structure is a specifically identified use category within respondent's City Code. PCC 33.920.210. Commercial parking structures are prohibited in either R-1 or RH multi-dwelling residential zones. The construction of four commercial parking structures outright, two additional lots by conditional use, and allowing commercial parking on surface lots that are either nonconforming or accessory to residential structures is a 'new use' that conflicts and is inconsistent with the Goal 5 protected Alphabet Historic District. Even though Design Review approval is required before a commercial parking use can commence, the Ordinance provides blanket exceptions to setback and lot coverage regulations that would otherwise apply in these two residential zones."

Nob Hill responds that

"the City Council heard extensive testimony and argument on the factual issue of whether the proposed parking regulations could adversely affect the historic district, including evidence that the restrictions placed on commercial parking would minimize impact and testimony that structured parking has functioned well in other historic districts without adverse impacts. The Council made specific findings of

---

[9] A " '[r]esource site' or 'site' is a particular area where resources are located. A site may consist of a parcel or lot or portion thereof or may include an area consisting of two or more contiguous lots or parcels." OAR 660-023-0010(10). We do not understand the parties to dispute that the resource site at issue in this case is the Alphabet Historic District that was placed on the National Register of Historic Resources in 2000.

fact determining that the limited parking provision does not conflict with the historic district."[10]

(Record citations omitted.) According to Nob Hill, because NWDA did not challenge those findings, they establish that the commercial parking structures are not a conflicting use. For that reason, Nob Hill contends that the requirements of OAR 660-023-0250(3)(b) have not been satisfied and Goal 5 does not apply.

As we have indicated, Goal 5 applies if the commercial parking structures are new uses that could be conflicting uses with the historic district. Although LUBA did not decide that issue, it did state that it

"tend[ed] to disagree with Nob Hill's contention that allowing 'commercial parking' in a historic district where that code-defined use type was not previously allowed is not a 'new use' for purposes of OAR 660-023-0250(3)(b). It also seems apparent that commercial parking structures 'could be' conflicting uses with historic structures in a historic district."

*NWDA*, 47 Or LUBA at 542. Further, LUBA noted that "[t]he city does not appear to dispute that commercial parking

---

[10] In particular, the city found, in part:

"3. **Goal 5, Open Space, Scenic and Historic Areas, and Natural Resources,** requires the conservation of open space and the protection of natural and scenic resources. The Parking Policy and Regulations amendment supports the district's historic core area known as the Alphabet Historic District because the:

"a. Parking Policy calls for providing and managing parking to serve the community while protecting and enhancing the livability of the district.

"b. The Zoning Code regulations designate 6 potential off-street parking sites adjacent to the 21st and 23rd main streets that do not involve a designated contributing or historic landmark structure, and by requir[ing] historic design review for development review of these 6 parking structure sites. Parking structure site regulations also limit the building height and number of parking spaces that are permitted on these sites along with an overall cap for the 6 sites that will minimize impacts to the historic district. Other Parking Policy and Regulation provisions seek to more efficiently utilize existing on and off-street parking resources, which may in the long-term negate the need for some of the 6 parking structures from being built."

(Boldface in original.)

structures are 'new uses' for purposes of OAR 660-023-0250(3)(b), or that such structures 'could be conflicting uses.' " *Id.*

We agree with NWDA, as LUBA appeared to do as well, that allowing commercial parking structures in the Alphabet Historic District where that specific code-defined use type was not previously allowed is a "new use." We also agree that such a use "could be conflicting"—that is, that the use *could* adversely affect the historic district. Unlike Nob Hill, we do not understand that the city found that the use could not be conflicting. Instead, as LUBA explained, "the city adopted findings that explain why the disputed commercial parking structures are consistent with preservation of protected historic structures and the historic district." In other words, the city did not determine that its decision *could* not adversely affect the historic district but instead found that its decision was structured to protect the historic district in a manner consistent with Goal 5. Those appear to be different inquiries. We conclude that Goal 5 applies to the city's decision.

■ Accordingly, we turn to NWDA's argument that a determination of ESEE consequences is required by the administrative rules that implement Goal 5. The rules implementing Goal 5, OAR 660-023-0000 to 660-023-0250,

"establish[ ] procedures and criteria for inventorying and evaluating Goal 5 resources and for developing land use programs to conserve and protect significant Goal 5 resources. This division explains how local governments apply Goal 5 when conducting periodic review and when amending acknowledged comprehensive plans and land use regulations."

OAR 660-023-0000. Those implementing rules consist of both "standard" and "specific" procedures and requirements for each type of Goal 5 resource. OAR 660-023-0020(1) describes the relationship between the standard and specific procedures:

"The standard Goal 5 process, OAR 660-023-0030 through 660-023-0050, consists of procedures and requirements to guide local planning for all Goal 5 resource categories. This division also provides specific rules for each of

the fifteen Goal 5 resource categories (see OAR 660-023-0090 through 660-023-0230). In some cases this division indicates that both the standard and the specific rules apply to Goal 5 decisions. In other cases, this division indicates that the specific rules supersede parts or all of the standard process rules (i.e., local governments must follow the specific rules rather than the standard Goal 5 process). In case of conflict, the resource-specific rules set forth in OAR 660-023-0090 through 660-023-0230 shall supersede the standard provisions in OAR 660-023-0030 through 660-023-0050."

OAR 660-023-0030 through 660-023-0050, the rules governing the standard Goal 5 process, provide the procedures for inventorying a resource, conducting an ESEE analysis, and developing a program to achieve Goal 5. OAR 660-023-0200, the specific rule governing Goal 5 historic resources, provides, however, that the standard process is modified or superseded by the specific provisions in that rule. Specifically, OAR 660-023-0200 provides, in part:

"(2) Local governments are not required to amend acknowledged plans or land use regulations in order to provide new or amended inventories or programs regarding historic resources, except as specified in this rule. The requirements of the standard Goal 5 process (see OAR 660-023-0030 through 660-023-0050) in conjunction with the requirements of this rule apply when local governments choose to amend acknowledged historic preservation plans and regulations. However, the sequence of steps in the standard process is not recommended, as per section (3) of this rule. The provisions in section (3) of this rule are advisory only. Sections (4) through (9) of this rule are mandatory for all local governments, except where the rule provides recommended or optional criteria.

"(3) Local comprehensive plans should foster and encourage the preservation, management, and enhancement of structures, resources, and objects of historic significance within the jurisdiction in a manner conforming with, but not limited by, the provisions of ORS 358.605. In developing local historic preservation programs, local governments should follow the recommendations in the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation. Where possible, local governments should develop a local historic context statement and

adopt a historic preservation plan and a historic preservation ordinance before commencement of local historic inventories.

    "* * * * *

    "(7)    Local governments are *not required* to apply the ESEE process in order to determine a program to protect historic resources.[11] Rather, local governments are encouraged to adopt historic preservation regulations regarding the demolition, removal, or major exterior alteration of all designated historic resources. Historic protection ordinances should be consistent with standards and guidelines recommended in the Standards and Guidelines for Archeology and Historic Preservation published by the U.S. Secretary of the Interior."

As we have already indicated, LUBA reasoned that, even if Goal 5 had been triggered by the city's actions here, OAR 660-023-0200(7) applied to the city's decision to allow the commercial parking structures and "exempts the city from the requirement to conduct an ESEE analysis." It is apparent that a critical question here is whether LUBA was correct in its determination that the city's decision is within the scope of the exemption in OAR 660-023-0200(7). In its decision, however, LUBA left unanswered the question whether, as here, an ordinance that allows a use that could conflict with a Goal 5 resource comes within the scope of OAR 660-023-0200(7) because it is within the definition of a "program" in OAR 660-023-0010(6). Although the rule that governs the applicability of Goal 5, OAR 660-023-0250(3)(b), includes the "could be conflicting" standard, the definition of a "program," OAR 660-023-0010(6), contains the "that conflicts" standard. Those two standards, however, appear to refer to the same subject. It is unclear to us how those two provisions interrelate in the context of the rules implementing Goal 5.

---

[11] A " '[p]rogram' or 'program to achieve the goal' is a plan or course of proceedings and action either to prohibit, limit, or allow uses that conflict with significant Goal 5 resources, adopted as part of the comprehensive plan and land use regulations (e.g., zoning standards, easements, cluster developments, preferential assessments, or acquisition of land or development rights)." OAR 660-023-0010(6).

Because LUBA did not address a key issue concerning the applicability of the exemption in OAR 660-023-0200(7)—that is, whether the city's decision is a "program to protect historic resources"—it is difficult for this court to conduct a meaningful review of that issue without LUBA's analysis in the first instance. It appears to us that, in order for LUBA to resolve the issue, it must, among other things, examine the ordinances that the city adopted in this case, the requirements in Goal 5 and the pertinent rules, and the responsiveness of the city's findings to those requirements.

The remaining issue here is whether, in view of the fact that LUBA did not address what we consider to be a critical issue, it is appropriate to remand this case to LUBA for it to reconsider the portion of its order concerning that question. In *Recovery House VI v. City of Eugene*, 150 Or App 382, 946 P2d 342 (1997), we noted that, as a general proposition, we do not remand a case to LUBA if the issue that requires resolution is a purely legal question. We also noted, however, that, under the statutory scheme concerning the review of land use decisions, "we have no authority * * * to review local land use decisions directly—or, in effect, to perform LUBA's role." *Id.* at 389. We said that "this court cannot always know whether the seemingly 'purely legal issues' that might appear at first blush to be definitive will necessarily prove to be either definitive or purely legal." *Id.* at 389-90. We concluded that,

> "[i]n any event, what is of consequence is that we cannot say with assurance at this point that this case is susceptible to a decision on *purely* legal grounds. We can say, however, that the process of defining the correct questions and the answers to them, by the parties and the deciding tribunals, is likely to be enhanced under circumstances of the kind involved here, if LUBA and we perform the sequential respective roles that the legislature has assigned to us."

*Id.* at 390 (emphasis added).

As we have already indicated, determining whether the city's decision is a "program to protect historic resources" under OAR 660-023-0200(7) may require that LUBA, among other things, examines the ordinances that the city adopted in this case, the requirements in Goal 5 and the pertinent

rules, and responsiveness of the city's findings to those requirements. Even if those issues are predominantly legal, there may be related factual issues. For example, depending on the requirements of Goal 5, LUBA might remand to the city to clarify how its findings establish those requirements. For that reason, we cannot say with assurance that that determination is purely legal in nature.[12] We believe that this is a situation in which the decision-making process will be enhanced if LUBA directly considers the issue on remand.[13]

Remanded in part for reconsideration; otherwise affirmed.

---

[12] Our discussion in the text illustrates why we cannot say with assurance that the issue that we remand to LUBA is purely legal in nature. We do not intend for that discussion to suggest what issues will require consideration by LUBA in its review on reconsideration.

[13] In light of our conclusion that LUBA must reconsider whether the city's actions are exempt from the ESEE process under OAR 660-023-0200(7), we do not address the legal requirements that Goal 5 and its implementing rules impose if the city's actions are not exempt.